UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JOHN GALE,                                  :

                                          :          **MEMORANDUM & ORDER**

                        Plaintiff,        :

                                            :          07-CV-5211 (DLI)(MDG)

                  -against-         :

                                          :

JANET NAPOLITANO,[1] Secretary of      :
Department of Homeland Security;      :
DEPARTMENT OF HOMELAND SECURITY;  :
KIP HAWLEY, Assistant Secretary/Administrator, :
Transportation Security Administration;     :
TRANSPORTATION SECURITY          :
ADMINISTRATION; MERIT SYSTEMS     :
PROTECTION BOARD,              :

                                          :

                    Defendants.      :
-----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff John Gale filed the instant complaint against the Department of Homeland Security ("DHS"), the Transportation Security Administration ("TSA"), and the Merit Systems Protection Board ("MSPB") on December 14, 2007. (*See generally* Docket Entry No. 1 ("Compl.") Plaintiff's action has two components. First, pursuant to 5 U.S.C. §§ 7702 & 7703, Plaintiff requests review of the MSPB administrative decision affirming his termination. (Compl. ¶¶ 25–26.) Second, Plaintiff alleges that Defendants violated Title VII of the Civil Rights Act of 1964 by discriminating against him due to his race, color, or national origin. (*Id.* ¶ 28.) Before the court are the parties' cross-motions for summary judgment as to the MSPB review, pursuant to Federal Rule of Civil Procedure 56. Also before the court is Defendants' motion for summary judgment as to the Title VII claim. For the reasons set forth below, Plaintiff's motion is denied, Defendants' motions are granted, and the action is dismissed in its entirety.

---

[1] Defendant Janet Napolitano is substituted for Defendant Michael Chertoff.

## I. BACKGROUND

### A. The Parties

Plaintiff is an African-American male, who began working as a Federal Air Marshal ("FAM") assigned to the New York Field Office in May 2003. (Declaration of Catherine M. Mirabile in Support of Defs.' Mot. ("Mirabile Decl.") Ex. A, ¶¶ 3, 9–10.) FAMs are employed by the TSA, which is part of the DHS. As a FAM, Plaintiff's primary responsibilities were to detect, deter and defend against terrorism in the aviation domain. (Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' Stmt.") 1–3.) This is typically accomplished by travel on commercial aircraft in plain clothes, accompanied by at least one other FAM. (*Id.* at 3.)

FAMs are issued service-duty weapons, which they are required to secure at all times on their person while on mission status. (*Id.*) In addition, FAMs are required to have a security clearance. (*Id.*) As TSA employees, FAMS are required to "demonstrate . . . behavior, both on and off the job, that reflect favorably on the government and on the public." (*Id*. at 29; *see also* Administrative Record of MSPB Proceedings ("A.R.") at 143–47.) TSA guidelines state that employees are not to engage in any activities that cause them to neglect their assigned duties, and its employees are further required to be "physically and mentally fit to perform their duties." (Defs.' Stmt. 29–30; *see also* A.R. 119). In addition, employees are to "report for duty at the time and place required by assignment," and "shall not leave their duty area without permission from their supervisor." (*Id.*)

When off-duty, FAMs are to "conduct themselves in a manner that will not reflect adversely on . . . [, or] cause embarrassment to the FAMS," and may not "behave in a manner that will cause their co-workers or the public to lose trust in them or question their reliability or judgment." (A.R. 120.) Examples of misconduct that could result in disciplinary action include

violations of the standards of conduct and misuse of alcohol. (*See id.*; *see also* Defs.' Stmt. 30.)

FAMs must keep their weapons concealed unless operationally necessary, and are prohibited

from carrying firearms after the consumption of alcohol "when their judgment and ability to

safely use and control a firearm is impaired." (A.R. 731–32; *see also* Defs.' Stmt. 31.) TSA

guidelines provide that disciplinary action may be taken against a FAM for either on- or off-duty

misconduct. (Defs.' Stmt. at 31.) The guidelines provide for progressive discipline, and supply

various factors for consideration in the determination of an appropriate penalty. (*See generally*

*id.* at 32–33.)

### B. Plaintiff's Disciplinary History[2]

On August 20, 2004, an American Airlines employee emailed Plaintiff's supervisors,

complaining that Plaintiff had made anti-Semitic comments about Hasidic Jews while at the

Long Beach, California airport. (Defs.' Stmt. 4.) The Deputy Special Agent in Charge ("DSAC")

of the New York Field Office, Michael Ball, spoke with Plaintiff the following day, and

informed him to avoid such conversations in the future. (*Id.* at 4–5.)

On August 23, 2005, while Plaintiff was on layover between missions in Millbrae,

California, local law enforcement stopped him in front of his hotel, in response to a report that a

black male adult was jumping into traffic and had gotten into a car. (*Id.* at 5.) A Millbrae Police

Department officer stated that he could smell alcohol on Plaintiff, and that Plaintiff's eyes were

---

[2] The background facts set forth in this section are drawn in part from Defendants' Statement of Undisputed Facts, submitted pursuant to Local Civil Rule 56.1. Plaintiff objects to a number of these facts on the ground that they are "based on irrelevant evidence that was not considered in the determination to terminate [him]." (*See generally* Docket Entry No. 26.) This objection is mooted by the fact that pending before the court is not only a review of the MSPB proceeding, but also the question of whether Plaintiff can make out a prima facie discrimination case. Plaintiff also objects that a number of Defendants' statements are "based on hearsay evidence." (*See generally id.*) This objection is meritless, as the statements in question simply indicate the contents of reports and letters. In the context of Defendants' motion to dismiss the Title VII claim, the court obviously construes all disputed facts in the light most favorable to Plaintiff.

watery, his speech was slurred, and his gait unsteady. (*Id.* at 6.) The Millbrae Police Department notified Plaintiff's FAM superiors, and Plaintiff submitted a written report regarding the incident upon his return to New York, in which he admitted to having two glasses of wine at dinner prior to the incident. (*Id.*)

In response to the Millbrae incident, Plaintiff was issued a Letter of Warning for unprofessional conduct, dated December 1, 2005. (A.R. 106–07.) The letter informed Plaintiff that it could be cited as a formal corrective action in any future disciplinary matter, and that repetition of such conduct could lead to more severe corrective action in the future. (*See id.*) Plaintiff filed a grievance for the Letter of Warning, which was denied by DSAC Ball. (Defs.' Stmt. 7–8.) Plaintiff did not file a "Step 2" grievance, and did not file a discrimination complaint related to this incident. (*Id.* at 8.)

On May 19, 2006, Plaintiff lost his government-issued Personal Digital Assistant ("PDA"), which contained sensitive information, but did not report its loss until May 22. (*Id.* at 8–9.) On July 26, 2006, Allan Keaney, Assistant Special Agent in Charge ("ASAC") for the New York Field Office, served Plaintiff with notice of a proposed one-day suspension for failure to timely report the loss of government equipment. (*Id.* at 9; *see also* A.R. 102–03.) Plaintiff submitted a written response via the Federal Law Enforcement Officers Association on August 14, 2006 in which he admitted that he failed to report the loss but attributed this to a "momentary lapse of judgment." (A.R. 97–101.) On October 11, 2006, Plaintiff was issued notice of a one-day suspension. (*Id.* at 92–94.) Plaintiff submitted a grievance, which DSAC Ball denied on November 8, 2006. (Defs.' Stmt. 10–11.) Plaintiff was informed that the notice of suspension would be placed in his Official Personnel Folder, and that any future violations

would subject him to more severe disciplinary action. (*Id*. at 10.) Plaintiff did not file an EEOC complaint regarding this disciplinary action. (*Id*. at 11.)

On June 30, 2005, Plaintiff was staying at the Sheraton Four Points Hotel near Los Angeles International Airport ("LAX") in between duty flights between New York and Los Angeles. (Defs.' Stmt. 11.) At approximately 9:00 PM, Plaintiff allegedly approached a flight attendant for Mexicana Airlines, Flor Cruz, who was also staying at the Sheraton, and pushed her and harassed her. (*Id.* at 11–12.) Cruz reported this to the hotel's security, and one of the guards, Howard Okorie, approached Plaintiff. Okorie stated that Plaintiff was intoxicated, smelled of alcohol, and brandished his firearm while speaking to him. (*Id*. at 12.) The hotel staff then contacted the Los Angeles Police Department ("LAPD"), who, after interviewing the witnesses, went to Plaintiff's room, where they found Plaintiff asleep, and disarmed him. (*Id.*) The LAPD contacted ASAC Fred Fukanaga, a supervisory FAM assigned to Irvine, California, who responded to the scene. (*Id*. at 12–13.) Fukanaga spoke with LAPD, hotel staff, and Plaintiff, and reported that Plaintiff was disheveled and smelled of alcohol. (*Id.* at 13.) Plaintiff flew back to New York in non-duty status, and was returned to duty status on July 6, 2005 pending an investigation into the Sheraton incident. (*Id.* at 13–14.)

Plaintiff's version of the incident is that he tapped Cruz on the shoulder in order to introduce himself and she, without any provocation, ran to hotel security. He suggests that he "did nothing to upset this woman other than to be born African American." Plaintiff also claimed that he was "adjusting," not brandishing, his firearm during his conversation with Okorie. He denied being intoxicated, and claimed that he had been courteous and cooperative during his interactions with the police and hotel security. (*See* A.R. 75–76.)

TSA Special Agents Luis Velasquez and Ralph Palmiere investigated the Sheraton incident. In so doing, they interviewed the Sheraton's Director of Security, ASAC Fukanaga, Okorie, Cruz, and two LAPD officers, and obtained sworn affidavits from Plaintiff and Okorie. (Defs.' Stmt. 15.) In a report dated May 31, 2006, Velasquez and Palmiere concluded that: Plaintiff's account of events conflicted with those of other witnesses; Plaintiff had admitted to having consumed at least six alcoholic beverages; the two LAPD officers opined that Plaintiff was intoxicated; and hotel security guards and a responding officer described Plaintiff as belligerent and unprofessional. (*See* A.R. 637–41.)

On October 19, 2006, Plaintiff missed the fourth flight of a four-flight mission between New York City and Washington, D.C. (Defs.' Stmt. 16.) According to Plaintiff, he had left the gate area to go to the bathroom without informing his partner, and did not realize he had missed their flight until thirty to forty-five minutes after it departed. (*Id.* at 16–17.) Due to Plaintiff's absence, his partner was the only FAM on the fourth flight. (*Id*. at 17.)

On January 22, 2007, Plaintiff received a Notice of his Proposed Removal, which contained ASAC Keaney's recommendation that Plaintiff be removed from his FAM position due to: (1) conduct unbecoming a FAM, to wit: the incident at the Sheraton Hotel on June 30, 2005; and (2) failure to make a scheduled flight mission, to wit: the fourth flight of his mission on October 19, 2006. (A.R. 84–87.) In proposing Plaintiff's termination, ASAC Keaney considered a number of factors, including Plaintiff's years of service, his past disciplinary record, and the nature of Plaintiff's misconduct. (*Id.* at 86.) Plaintiff, again via the Federal Law Enforcement Officers Association, provided a written response to his proposed removal on February 6, 2007. (*Id.* at 74–79.) He stated that, with respect to the Sheraton Hotel incident, he was "the victim of a misunderstanding and overreaction on the part of . . . Cruz," (*id.* at 75), and

characterized his missed flight as "a comedy of errors," averring that he would not repeat the mistake. (*Id.* at 77.)

On May 31, 2007, DSAC Ball informed Plaintiff via letter that he was being removed from his position as a FAM effective June 1, 2007. (A.R. 58–62.) DSAC Ball wrote that, in making this determination, he considered Plaintiff's years of service, his prior disciplinary history, the serious nature of his offenses, the high standard of conduct placed upon law enforcement officers, the various policies and guidelines Plaintiff violated, and how Plaintiff's behavior reflected poorly on the TSA. (*See id.* at 59.) DSAC Ball evaluated all available information pertaining to the charges against Plaintiff, including his oral and written responses to the Notice of Proposed Removal. With respect to the Sheraton incident, he found that Plaintiff's version of events conflicted with statements given by other witnesses and was not supported by any independent evidence, and thus lacked credibility. (*Id.*)

## C.    Administrative Proceedings

On June 28, 2007, Plaintiff appealed his termination to the MSPB, alleging that: (1) he had been removed from service without just cause; (2) his termination was disproportionately harsh when compared to similarly situated non-African American FAMs; and (3) the TSA had violated its own rules and regulations in using untimely violations against him. (A.R. 5–10.) On September 10, 2007, MSPB Administrative Law Judge ("ALJ") JoAnn M. Ruggiero held a hearing, at which Okorie, Fukanaga, Velasquez, Keaney, Ball, and Plaintiff testified. (*See generally id.* at 734–813.)

On October 23, 2007, the ALJ affirmed the agency's decision to terminate Plaintiff's employment in a written decision. (*See generally* A.R. 590–613.) With respect to the Sheraton hotel incident, the ALJ found the other witness's accounts of the events to be more credible than

that of Plaintiff's. (*Id*. at 599–600.) The ALJ rejected Plaintiff's affirmative defense of race discrimination, and concluded that because of his disciplinary history, his case was distinguishable from that of other FAMs who had missed flights and not been terminated. (*See id.* at 602.) The ALJ also rejected Plaintiff's argument that the delay in the TSA's internal investigation constituted harmful error because of the loss of hotel security tapes on the ground that this involved "the merits of the agency's action," as opposed to the "agency's procedures." (*Id.* at 602–03 (emphasis in original).) The ALJ concluded that the agency met its burden of demonstrating that Plaintiff's termination would promote the "efficiency of service," as Plaintiff's actions on June 30, 2005 "raise[d] serious doubts as to his judgment" and "caused embarrassment to the agency," and his actions on October 19, 2006 "compromised the safety" of his partner and the aircraft's crew and passengers. (*Id*. at 603–04.) In sum, the ALJ concluded that "the penalty of removal—albeit harsh—[was] within the limits of reasonableness." (*Id*. at 607.)

## II. DISCUSSION

"Pursuant to . . . the Civil Service Reform Act, 5 U.S.C. § 7701 *et seq*, qualified federal employees may appeal specified adverse employment decisions to the MSPB. If the case . . . involves an appeal from an ordinary personnel action coupled with an allegation that the action was discriminatory," judicial review of the MSPB order lies with the district court. *Marro v. Nicholson*, 2008 WL 699506, at *5 (E.D.N.Y. Mar. 12, 2008) (citing 5 U.S.C. § 7703(b)(2); *Murray v. United States Dep't of Justice*, 821 F. Supp. 94, 101 (E.D.N.Y. 1993)). Because different standards of review apply, the court considers each component of the instant action separately. *See Marro*, 2008 WL 699506, at *5.

### A. Review of MSPB Decision

#### 1. Standard of Review

A decision of the MSPB must be upheld unless it was: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). The "arbitrary and capricious" standard "is extremely narrow, and allows the [MSPB] wide latitude in fulfilling its obligation to review agency disciplinary actions." *United States Postal Serv. v. Gregory*, 534 U.S. 1, 6–7 (2001) (citations omitted). "[A]n agency is required to prove only the essence of its charge[s against an employee], and need not prove each factual specification in support of its charge." *Marro*, 2008 WL 699506, at *14 (citations and internal quotation marks omitted). An MSPB ALJ's "determinations regarding witness credibility are virtually unreviewable, since the determination of the credibility of the witnesses is within the discretion of the presiding official who heard their testimony and saw their demeanor." *Id.* at *15 (citations and internal quotation marks omitted). Furthermore, an ALJ "possesses significant discretion to determine what evidence he or she will permit to be presented." *Id.* (citations and internal quotation marks omitted). Finally, "review of the penalty imposed by the agency is highly deferential." *Id.* at *20 (citations and internal quotation marks omitted).

Here, Plaintiff argues that the MSPB order was "arbitrary and capricious" for several reasons. First, he claims that the TSA did not consider all of the appropriate factors when making its decision to terminate his employment. (*See* Docket Entry No. 19-1 ("Pl.'s Mem. in Supp. of Summ. J.") at 19–20.) Second, Plaintiff claims that the TSA failed to prove that his termination would promote the "efficiency of the service." (*See id.* at 21–24.) Finally, Plaintiff claims that

the ALJ erred in finding that the eighteen-month delay in charging him did not constitute harmful error. (*See id.* at 24–26.) The court addresses each argument in turn.[3]

### 2.     The *Douglas* Factors

*Douglas v. Veterans Administration* outlined twelve factors that are relevant to determining the appropriateness of a penalty imposed by an administrative agency. *See* 5 M.S.P.B. 313, 331–32 (1981). These factors are:

> (1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;
> (2) the employee's job level and type of employment…contacts with the public, and prominence of the position;
> (3) the employee's past disciplinary record;
> (4) the employee's past work record, including length of service, performance on the job… and dependability;
> (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;
> (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;
> (7) consistency of the penalty with any applicable agency table of penalties;
> (8) the notoriety of the offense or its impact upon the reputation of the agency;
> (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;
> (10) the potential for the employee's rehabilitation;
> (11) mitigating circumstances surrounding the offense, such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and
> (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*Id*. at 332. Importantly, "[n]ot all of these factors will be pertinent in every case," and "[i]n considering whether the agency's judgment was reasonably exercised, it must be borne in mind

---

[3] Because the court must review Plaintiff's discrimination claim *de novo*, his argument that the ALJ erred in rejecting his affirmative defense of race discrimination is not addressed here, and is instead addressed in Part II.B, *infra*. *See* 5 U.S.C. § 7703(c); *see also Ugarte v. Johnson*, 40 F. Supp. 2d 178, 181 (S.D.N.Y. 1999).

that the relevant factors are not to be evaluated mechanistically by any preordained formula." *Id.* Indeed, the Federal Circuit has specifically held that it is not "reversible error if [an agency] fails expressly to discuss all of the *Douglas* factors." *Kumferman v. Dep't of the Navy*, 785 F.2d 286, 291 (Fed. Cir. 1986).

Here, the record is clear that DSAC Ball considered all of the relevant *Douglas* factors in his decision to terminate Plaintiff. For example, DSAC Ball stated that he considered the "serious nature of the offense[s] and [their] relationship to [Plaintiff's] employment" with the TSA, and noted Plaintiff's past disciplinary record, including the December 2005 letter of warning and his October 2006 suspension, which together constitute clear references to the first and third *Douglas* factors. (A.R. 59.) Furthermore, in finding that Plaintiff's length of service was offset by the serious nature of his offenses, DSAC Ball noted that Plaintiff had served for nearly four years as an FAM, a reference to the fourth *Douglas* factor. (*See id.* at 60.) DSAC Ball also noted that Plaintiff's behavior "reflected unfavorably on the government" and negatively affected the agency's ability "to maintain the public trust," which implicate the fifth and eighth *Douglas* factors. (*Id.* at 59, 61.) Finally, with respect to the eleventh *Douglas* factor, DSAC Ball considered that Plaintiff took responsibility and was remorseful for missing his flight mission in October 2006. (*See id.* at 59.)

This record belies Plaintiff's claim that "the agency's decision . . . utterly failed to taken [*sic*] into consideration the *Douglas* factors." (Pl.'s Mem. in Supp. of Summ. J. 19.) Nothing with respect to the agency's consideration of the *Douglas* factors warrants reversal of its penalty decision, especially in light of the highly deferential standard of review to which the agency is entitled in this area. *See Marro*, 2008 WL 699506, at *20; *see also Hayes v. Dep't of Navy*, 727 F.2d 1535, 1540 (Fed. Cir. 1984) ("When the MSPB is satisfied that all relevant factors have

been considered by the agency and that there has been a responsible balancing of those factors . . . that ends the matter."); *Murray*, 821 F. Supp. at 110 ("Since the Board considered and weighed all the relevant factors in making its determination that [Plaintiff's] discharge was an appropriate sanction, its decision must be upheld.").

Plaintiff nevertheless argues that DSAC Ball's failure to consider his use of alcohol as one of the mitigating factors constitutes an abuse of discretion. (Docket Entry No. 21 ("Pl.'s Reply"), at 2.) This argument is unavailing. Given that Plaintiff's use of alcohol was an integral component of the offense for which he was, in part, being terminated, DSAC Ball clearly "considered" it. (*See* A.R. 637–41 (TSA report containing several references to Plaintiff's use of alcohol on June 30, 2005).) The fact that DSAC Ball implicitly found it to weigh *against* Plaintiff, rather than in his favor, is not unreasonable, given that TSA guidelines list "misuse of alcohol" as an example of off-duty misconduct. (A.R. 120.) Furthermore, Plaintiff makes no argument whatsoever as to *why* his use of alcohol should mitigate his punishment. Indeed, the policy reasons against employing persons with alcoholism as FAMs are simply too obvious to warrant mention.

### 3.    Efficiency of the Service

"[A]n agency may [remove] an employee only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). The Second Circuit takes an expansive view of this phrase, and has held that "where an employee's misconduct is in conflict with the mission of the agency, dismissal without proof of a direct effect on the individual's job performance is permissible under the 'efficiency of the service' standard." *Borsari v. FAA*, 699 F.2d 106, 110 (2d Cir. 1983).

Here, Plaintiff's failure to be on board the October 19, 2006 flight was clearly "in conflict with the mission of the agency," which is, after all, to protect flights, such as the one Plaintiff was unable to make, from terrorist attacks. *See Borsari*, 699 F.2d at 110. Regardless of whether it occurred because of a "comedy of errors," the court agrees that Plaintiff's failure to make his assigned flight constituted misconduct that compromised the safety of his partner, as well as that of the passengers and crew, and the general public. (*See* A.R. 603–04.) Indeed, FAMs assigned to the New York Field Office should be especially cognizant of the fact that there is nothing "comical" about the threat of airline terrorism. Plaintiff's actions at the hotel on June 30, 2005 were also "in conflict with the mission of the agency," as they negatively affected the TSA's ability to maintain the public's trust. *See Borsari*, 699 F.2d at 110; *see also Murray*, 821 F. Supp. at 109 (FBI agent's off-duty violent outburst, which was witnessed by a crowd, "had an adverse on the public mission of the FBI"). In sum, because of his inability to accomplish his own assigned missions and his adverse impact on the TSA's overall effectiveness, Plaintiff's termination clearly promoted the efficiency of that agency, and the court accordingly declines to overrule the TSA decision.[4]

### 4. Harmful Error

An agency's decision may not be sustained where a plaintiff "shows harmful error in the application of the agency's procedures in arriving at such decision." 5 U.S.C. § 7701(c)(2)(A). "Harmful error" is "[e]rror by the agency in the application of its procedures which, in the absence or cure of the error, might have caused the agency to reach a conclusion different than

---

[4] Plaintiff makes much of the fact that he was not terminated until eighteen months after the hotel incident, arguing that this weighs against any finding that his termination promoted the efficiency of the service. (*See* Docket Entry No. 28 at 7.) This argument ignores the fact that during this eighteen-month period, Plaintiff missed his assigned mission flight, an incident of severe misconduct that was extensively cited by the TSA as one of the reasons for his termination.

the one reached." 5 C.F.R. § 1201.56(c)(3). "The burden is upon [a plaintiff] to show that based

upon the record as a whole, the error was harmful, i.e., caused substantial harm or prejudice to

his/her rights." *Id.*

Here, Plaintiff claims that the "extraordinarily long delay between the [Sheraton incident]

and his Notice of Charges" constituted harmful error "because in delaying the filing of the

charges the agency was unable to obtain definitive evidence." (Pl.'s Mem. in Supp. of Summ. J.

24.) Furthermore, he claims that the agency's failure to "timely apprise [him] of the charges . . .

resulted in the destruction of the only piece of evidence that could have definitively exonerated

him." (*Id.* at 25.)

As an initial matter, these self-serving statements, unsupported by any other evidence that

the missing video tapes would, in fact, have exonerated him, are insufficient to meet Plaintiff's

burden of showing harmful error. *See* 5 C.F.R. § 1201.56(c)(3). Furthermore, Plaintiff fails to

identify any "error" in the "application of [TSA] procedures." *Id.* The agency was under no

obligation to obtain the tapes; indeed, Plaintiff was aware of the investigation into the Sheraton

incident *prior* to receiving notice of his proposed termination, and could have attempted to

obtain copies of the tapes himself during that time. (*See* Mirabile Decl., Ex. B at 186–88, 221.)

Even assuming, *arguendo*, that the TSA's delay in notifying Plaintiff of his proposed

termination was error, Plaintiff cannot meet his burden of demonstrating that this error caused

him substantial harm or prejudice.  *See* 5 C.F.R. § 1201.56(c)(3). As Defendants note, Plaintiff

had the opportunity to respond to the notice of his proposed termination, testify before the ALJ,

call witnesses, and cross-examine the agency's witnesses. The fact that the ALJ chose to credit

the agency's witnesses' account of the hotel incident over Plaintiff's testimony is not grounds for

reversal by this court, which, unlike the ALJ, had no opportunity to observe the witnesses'

demeanor. (*See* A.R. 599–600, 758–61.) Accordingly, the court declines the invitation to revisit these credibility determinations. *See Marro*, 2008 WL 699506, at \*15 (witness credibility determinations of ALJs "are virtually unreviewable").

### B. Title VII Discrimination Claim

#### 1. Standard of Review

Under Title VII, it is "an unlawful employment practice for an . . . employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also Zahorik v. Cornell University*, 729 F.2d 85, 91 (2d Cir. 1984). "The Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Figueroa v. N.Y. Health & Hospitals Corp.*, 500 F. Supp. 2d 224, 227–28 (S.D.N.Y. 2007) (citations and internal quotation marks omitted). Summary judgment in an employment discrimination case may still be warranted, however, if the plaintiff relies "'on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct.'" *Id.* (citation omitted). "This is because, as the Second Circuit has stated, '[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'" *Id.* (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

To prevail against a motion for summary judgment, a plaintiff alleging discrimination must satisfy the three-part burden-shifting test laid out by *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973). "[A] a plaintiff first bears the 'minimal' burden of setting out a *prima facie* discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a 'legitimate, nondiscriminatory reason' for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citations omitted).

### 2. Prima Facie Case

To establish a prima facie case in a Title VII race discrimination action, a plaintiff must show: (1) that he was within a protected group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination. *Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir. 1994) (citations omitted); *see also McDonnell Douglas*, 411 U.S. at 802. The final element requires a plaintiff to show that "similarly situated" individuals outside his protected class were treated differently. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981). Specifically, in the context at bar, the plaintiff must show that similarly situated co-employees received lesser punishments for similar misconduct. *See Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

Here, Plaintiff alleges that Employees E, I, M, N, P, Q, S, T, U, V, X, Y, Z, and AA, all of whom are Hispanic or White FAMS, were similarly situated employees who received lesser punishment for similar misconduct. (*See generally* A.R. 322–442). However, unlike Plaintiff, none of the aforementioned employees were charged with *both* failure to make a scheduled mission *and* conduct unbecoming a FAM, meaning that they were not, in fact, similarly situated. (*See* Defs.' Stmt. 24–28.) Employees E, I, M, P, Q, S, T, U, and V all missed scheduled missions, as did Plaintiff, but were not terminated. However, none of these employees had any

16

prior disciplinary history, in stark contrast to Plaintiff, whose prior disciplinary history was extensive. (*See id.* at 4–14.)

The most similarly situated employee to Plaintiff is Employee X, who was disciplined with a six-day suspension for conduct unbecoming a federal law enforcement officer after being intoxicated in a hotel and having an altercation with the hotel staff. (A.R. 418–23.) However, Employee X's prior disciplinary history was not as extensive as Plaintiff's as it included only a three-day suspension for misuse of a government credit card. (A.R. 325.) More importantly, Employee X did not also miss a scheduled mission flight. In sum, because Plaintiff fails to offer any "similarly-situated" individuals who received lesser punishments for similar misconduct, he is unable to make out a prima facie Title VII discrimination claim. *See Graham*, 230 F.3d at 40; *see also Rommage v. MTA Long Island Rail Rd.*, 2010 U.S. Dist. LEXIS 104882 (E.D.N.Y. Sept. 30, 2010).

### 3.  Legitimate, Non-Discriminatory Reason for Termination

Even if Plaintiff could make out a prima facie case of racial discrimination, the government has met its burden of offering a legitimate, non-discriminatory reason for Plaintiff's termination. As discussed in Part I.B, *supra*, Plaintiff's relatively short tenure as a FAM included a number of increasingly serious episodes of misconduct, including the alcohol-related hotel harassment incident, and culminating in Plaintiff's missing his assigned mission flight. This conduct violated the codes of conduct by which FAMs are required to abide, and the TSA was well within its discretion to terminate Plaintiff for it. Accordingly, the burden shifts back to Plaintiff to prove that this proffered reason for his termination was merely a pretext for discrimination. *McPherson*, 457 F.3d at 215; *see also McDonnell Douglas*, 411 U.S. at 802.

### 4. Pretext for Discrimination

With respect to pretext, "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006). The instant record, which exhaustively documents Plaintiff's misconduct, gives no indication that Plaintiff was terminated for any reason other than this misconduct. Indeed, Plaintiff does not deny any of this misconduct, with the exception of the hotel incident.[5] His case boils down to his own unsubstantiated allegation that the only reason he received such severe punishment for this misconduct was his race. However, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Meiri*, 759 F.2d at 998). Accordingly, the court finds that Defendants' stated reasons for terminating Plaintiff were not mere pretexts for discrimination. Thus, notwithstanding his ability to make out a prima facie discrimination case, Plaintiff's Title VII claim fails as a matter of law.

---

[5] It is worth repeating that the TSA conducted a comprehensive investigation into this incident, which generated a report that cast serious doubt upon Plaintiff's version of events. The ALJ then held a lengthy fact-finding hearing, which included testimony from all the relevant witnesses, and found Plaintiff to be not credible.

**III.   CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment with respect to review of the MSPB decision is denied, Defendants' cross-motion is granted, and the agency decision is affirmed. Defendants' motion for summary judgment with respect to the Title VII discrimination claim is granted, and the action is dismissed in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
       March 2, 2011

_____/s/_____
DORA L. IRIZARRY
United States District Judge